## UPSHAW *v.* UNITED STATES.

No. 98.   Argued November 12, 1948.—Decided December 13, 1948.

*Joel D. Blackwell* argued the cause for petitioner. With him on the brief was *James T. Wright.*

*Robert S. Erdahl* argued the cause for the United States.   With him on the brief were *Solicitor General Perlman* and *Beatrice Rosenberg.*

MR. JUSTICE BLACK delivered the opinion of the Court.

The petitioner was convicted of grand larceny in the United States District Court for the District of Columbia and sentenced to serve sixteen months to four years in prison.   Pre-trial confessions of guilt without which peti-

tioner could not have been convicted [1] were admitted in evidence against his objection that they had been illegally obtained. The confessions had been made during a 30-hour period while petitioner was held a prisoner after the police had arrested him on suspicion and without a warrant.

Petitioner's objection to the admissibility of the confessions rested on Rule 5 (a) of the Federal Rules of Criminal Procedure and our holding in *McNabb* v. *United States,* 318 U. S. 332. Rule 5 (a) provides that "An officer making an arrest . . . shall take the arrested person without unnecessary delay before the nearest available" committing magistrate and when the arrested person appears before the magistrate "a complaint shall be filed forthwith." Petitioner contended that the officers had violated this rule in detaining him as they did without taking him before a committing magistrate. In the *McNabb* case we held that confessions had been improperly admitted where they were the plain result of holding and interrogating persons without carrying them "forthwith" before a committing magistrate as the law commands.

In this case the District Court thought that the *McNabb* ruling did not apply because the detention of petitioner "was not unreasonable under the circumstances as a matter of law." Consequently, that court held the confessions admissible. On appeal to the United States Court of Appeals for the District of Columbia, the United States Attorney and his assistants detailed the circumstances of petitioner's arrest and detention and

---

[1] After the evidence was all in, the trial judge stated that without the confessions there was "nothing left in the case." The trial judge instructed the jury to acquit if they found that the petitioner had not confessed "voluntarily but because he was beaten." On this issue of physical violence the jury found against the petitioner, and therefore this issue is not involved in this case.

confessed error. They concluded from these detailed circumstances that the "delay" in carrying petitioner before a committing magistrate "was unreasonable and the purpose of it, as stated by the officers themselves, was only to furnish an opportunity for further interrogation." Under these circumstances, the district attorney thought that the *McNabb* rule made the confessions inadmissible without regard to whether they were "voluntary" in the legal sense. The delay in taking petitioner before a judicial officer was thought, in the words of the district attorney, to have been "for purposes inimical to the letter and spirit of the rule requiring prompt arraignment."

The Court of Appeals rejected this confession of error, one judge dissenting. 83 U. S. App. D. C. 207, 168 F. 2d 167. It read the *McNabb* case as explained in *United States* v. *Mitchell,* 322 U. S. 65, as holding that "A confession voluntarily given is admissible in evidence" while conversely "a confession involuntarily made is inadmissible." 83 U. S. App. D. C. 207, 168 F. 2d 167. That court thought the *McNabb* case did no more than extend the meaning of "involuntary" confessions to proscribe confessions induced by psychological coercion as well as those brought about by physical brutality. Finding no psychological coercion in the facts of this case, the court concluded that the confessions were not the "fruit of the illegal detention." The court also laid stress on the fact that the petitioner's detention unlike McNabb's, "was not aggravated by continuous questioning for many hours by numerous officers."

We hold that this case falls squarely within the *McNabb* ruling and is not taken out of it by what was decided in the *Mitchell* case. In the *McNabb* case we held that the plain purpose of the requirement that prisoners should promptly be taken before committing magistrates was to check resort by officers to "secret interrogation of persons accused of crime." We then

pointed out the circumstances under which petitioners were interrogated and confessed. This was done to show that the record left no doubt that the McNabbs were not promptly taken before a judicial officer as the law required, but instead were held for secret questioning, and "that the questioning of the petitioners took place while they were in the custody of the arresting officers and before any order of commitment was made." The Mc-Nabb confessions were thus held inadmissible because the McNabbs were questioned while held in "plain disregard of the duty enjoined by Congress upon federal law officers" promptly to take them before a judicial officer. In the *McNabb* case there were confessions "induced by illegal detention," *United States* v. *Mitchell, supra* at 70, a fact which this Court found did not exist in the *Mitchell* case.

In the *Mitchell* case although the defendant was illegally held eight days, the court accepted the record as showing that Mitchell promptly and spontaneously admitted his guilt within a few minutes after his arrival at the police station. Mitchell's confessions therefore were found to have been made before any illegal detention had occurred. This Court then stated in the *Mitchell* opinion that "the illegality of Mitchell's detention does not retroactively change the circumstances under which he made the disclosures." Thus the holding in the *Mitchell* case was only that Mitchell's subsequent illegal detention did not render inadmissible his prior confessions. They were held not to involve "use by the Government of the fruits of wrongdoing by its officers." The *Mitchell* case at p. 68, however, reaffirms the *Mc-Nabb* rule that a confession is inadmissible if made during illegal detention due to failure promptly to carry a prisoner before a committing magistrate, whether or not the "confession is the result of torture, physical or psychological . . . ."

In this case we are left in no doubt as to why this petitioner was not brought promptly before a committing magistrate. The arresting officer himself stated that petitioner was not carried before a magistrate on Friday or Saturday morning after his arrest on Friday at 2 a. m., because the officer thought there was not "a sufficient case" for the court to hold him, adding that even "if the Police Court did hold him we would lose custody of him and I no longer would be able to question him." Thus the arresting officer in effect conceded that the confessions here were "the fruits of wrongdoing" by the police officers. He conceded more: He admitted that petitioner was illegally detained for at least thirty hours for the very purpose of securing these challenged confessions. He thereby refutes any possibility of an argument that after arrest he was carried before a magistrate "without unnecessary delay."

The argument was made to the trial court that this method of arresting, holding, and questioning people on mere suspicion was in accordance with the "usual police procedure of questioning a suspect . . . ." However usual this practice, it is in violation of law, and confessions thus obtained are inadmissible under the *McNabb* rule. We adhere to that rule.[2]

*Reversed.*

MR. JUSTICE REED, with whom THE CHIEF JUSTICE, MR. JUSTICE JACKSON and MR. JUSTICE BURTON join, dissenting.

When not inconsistent with a statute, or the Constitution, there is no doubt of the power of this Court to institute, on its own initiative, reforms in the federal practice

---

[2] Our holding is not placed on constitutional grounds. Since the *McNabb* rule bars admission of confessions we need not and do not consider whether their admission was a violation of any of the provisions of the Fifth Amendment.

as to the admissibility of evidence in criminal trials in federal courts.[1] This power of reform, which existed at the time, March 1, 1943, *McNabb* v. *United States,* 318 U. S. 332, was decided, is not, I believe, restricted by the language of Rule 26 of the Federal Rules of Criminal Procedure, effective March 21, 1946. Federal Rule of Criminal Procedure No. 59; 91 Cong. Rec. 12,545. The admissibility of evidence, like the competency of witnesses, is "governed by common law principles as interpreted and applied by the federal courts in the light of reason and experience." *Wolfle* v. *United States,* 291 U. S. 7, 12.[2] While judicial innovations explicitly expanding or contracting admissibility of evidence are rare,

---

[1] 54 Stat. 688, 18 U. S. C. § 687.

Rules of Criminal Procedure for the District Courts of the United States, together with Notes to the Rules, 79th Cong., 2d Sess., S. Doc. No. 175.

No change was made in the law by P. L. 772, 80th Cong., effective September 1, 1948, § 20, 62 Stat. 683, 862. 18 U. S. C. § 595 is not in effect but has been superseded by Rule 5 (a) of the Rules of Criminal Procedure for the District Courts of the United States:

"5 (a) APPEARANCE BEFORE THE COMMISSIONER. An officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available commissioner or before any other nearby officer empowered to commit persons charged with offenses against the laws of the United States. When a person arrested without a warrant is brought before a commissioner or other officer, a complaint shall be filed forthwith."

[2] *Funk* v. *United States,* 290 U. S. 371, 383:

"The final question to which we are thus brought is not that of the power of the federal courts to amend or repeal any given rule or principle of the common law, for they neither have nor claim that power, but it is the question of the power of these courts, in the complete absence of congressional legislation on the subject, to declare and effectuate, upon common law principles, what is the present rule upon a given subject in the light of fundamentally altered conditions, without regard to what has previously been declared and practiced."

there have been sufficient occasions to establish by precedent and legislative acceptance that the power exists. *McNabb* v. *United States, supra,* 341.[3]

Such power should be used to change the established rules of evidence, however, only when "fundamentally altered conditions," note 2, *supra,* call for such a change in the interests of justice. Otherwise the bad results from a change of well-established rules are quite likely to outweigh the good. The lack of any necessity for changing the rules of evidence to protect an accused led me to dissent in the *McNabb* case, a murder case where an assumed failure to commit the prisoners apparently was relied upon as a partial basis for denying admissibility to certain confessions.

My objection to this Court's action of today in what seems to me an extension of the scope of nonadmissibility of confessions in the federal courts is not to its power so to act but to the advisability of such an additional step. Unless Congress or a majority of this Court modifies the *McNabb* rule, I feel bound to follow my understanding of its meaning in similar cases that may arise, but that duty does not impose upon me the obligation to accept this ruling as to Upshaw which seems to me to compound certain unfortunate results of the *McNabb* decision by extending it to circumstances beyond the scope of the *McNabb* ruling. This attitude leads me (I) to analyze the *McNabb* case and its offspring, (II) to point out why I think the present decision goes beyond the holding in *McNabb* and (III) to point out why *McNabb* should not be extended.

---

[3] Of the cases cited, only *United States* v. *Wood,* 14 Pet. 430, and *Funk* v. *United States,* 290 U. S. 371, involve a change by this Court of a rule of evidence which had become firmly entrenched in our federal jurisprudence. The other cases involve a choice between conflicting rules or the establishment of a rule where none had theretofore existed.

The judicial approach to the problem, of course, must be in a spirit of cooperation with the police officials in the administration of justice. They are directly charged with the responsibility for the maintenance of law and order and are under the same obligation as the judicial arm to discharge their duties in a manner consistent with the Constitution and statutes. The prevention and punishment of crime is a difficult and dangerous task, for the most part performed by security and prosecuting personnel in a spirit of public service to the community. Only by the maintenance of order may the rights of the criminal and the law-abiding elements of the population be protected. As has been pointed out by this Court in the *McNabb* and *Mitchell* cases, *United States* v. *Mitchell,* 322 U. S. 65, there is no constitutional problem involved in deciding whether a voluntary confession given by a prisoner prior to commitment by a magistrate should be admitted in evidence. A prisoner's constitutional rights against self-incrimination or to due process are protected by the rule that no involuntary confession may be admitted. *McNabb* v. *United States, supra,* pp. 339–40 and cases cited; *Haley* v. *Ohio,* 332 U. S. 596; *Malinski* v. *New York,* 324 U. S. 401; *Ashcraft* v. *Tennessee,* 322 U. S. 143.

## I.

Our first inquiry, then, is as to the legal doctrine behind the *McNabb* decision.

A. Were the McNabb confessions barred as a punishment or penalty against the police officers because they were thought to have disobeyed the command of a statute?

B. Were they barred because unlawful imprisonment is so apt to be followed by an involuntary confession as to justify the exclusion of all confessions received before judicial commitment after a prisoner is kept in custody

418

more than a reasonable time without being taken before a committing magistrate?

C. Were they barred because the particular circumstances under which the confessions were made were so likely to produce involuntary confessions as to justify exclusion?

A. As the *McNabb* decision was a sudden departure from the former federal rule as to the admissibility of confessions[4] initiated by the Court, without the benefit of brief or argument and without knowledge of the actual facts as to commitment,[5] it can hardly be expected that

---

[4] 318 U. S. 338–39:

". . . Relying upon the guarantees of the Fifth Amendment that no person 'shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law,' the petitioners contend that the Constitution itself forbade the use of this evidence against them. The Government counters by urging that the Constitution proscribes only 'involuntary' confessions, and that judged by appropriate criteria of 'voluntariness' the petitioners' admissions were voluntary and hence admissible."

The Court was establishing what it thought were "civilized standards of procedure and evidence." P. 340.

[5] As no question was raised by the defendants in the *McNabb* case because of prolonged police detention before commitment, the record did not show when they were committed. Dissent *McNabb* v. *United States* at p. 349. The Court assumed that detention without commitment lasted for Freeman and Raymond McNabb from between one and two o'clock Thursday morning, when they were arrested twelve miles from Chattanooga, until the completion of the questioning about two o'clock Saturday morning, forty-eight hours later. One cannot tell from the opinion when Freeman and Raymond confessed or to what. A third McNabb, Benjamin, was not taken into custody until between eight and nine o'clock Friday morning. He confessed after five or six hours. The Court assumed that he had not been committed prior to confession. *McNabb* v. *United States, supra*, pp. 334–38.

So far as the ruling in the *McNabb* case is concerned, the Court's understanding of the facts, as stated in the opinion, is the basis for the decision. Apparently Freeman and Raymond were by 10:30

it could have the desirable explicitness of a trite rule of evidence. Consequently confusion immediately arose as to its meaning. The dissent interpreted the opinion as a direction to exclude the confessions "because in addition to questioning the petitioners, the arresting officers failed promptly to take them before a committing magistrate." It concluded: "The officers of the Alcohol Tax Unit should not be disciplined by overturning this conviction." *McNabb* v. *United States, supra,* p. 349. Some courts thought that any confession obtained before commitment was inadmissible. *United States* v. *Hoffman,* 137 F. 2d 416, 421; *Mitchell* v. *United States,* 78 U. S. App. D. C. 171, 172, 138 F. 2d 426, 427. Others have understood the case to determine admissibility of confessions by a coercion test.[6] Varying impressions as to the rule that the *McNabb* case announced appear in the cases.[7] The Spe-

---

a. m. of the morning of their arrest committed for operating an illicit still, another crime than, though connected with, the murder for which they were convicted. Benjamin was committed for murder within four hours of his surrender. Petition for Rehearing, pp. 3–5.

See new trial, *McNabb* v. *United States,* 142 F. 2d 904. This commitment for a different crime was a sufficient compliance with the commitment statute to justify the admission of the confessions in the second McNabb trial, in the view of the Circuit Court of Appeals for the Sixth Circuit.

[6] *Brinegar* v. *United States,* 165 F. 2d 512, 515; *Ruhl* v. *United States,* 148 F. 2d 173, 175; *Paddy* v. *United States,* 143 F. 2d 847, 852; *United States* v. *Grote,* 140 F. 2d 413, 414–15; *United States* v. *Klee,* 50 F. Supp. 679.

[7] The following statements have been made concerning *McNabb:* "The court then held the confessions obtained by third degree methods were inadmissible . . . ." *State* v. *Behler,* 65 Idaho 464, 469, 146 P. 2d 338, 340. "The courts are not concerned with the practices of the police except in so far as they may be asked to use evidence thereby obtained against the will of the accused." *People* v. *Fox,* 148 P. 2d 424, 431 (Calif.). ". . . the new doctrine of constitutional rights under the due process clause announced by the Supreme Court of the United States in *McNabb* v. *United States* . . . ." *Thompson*

cial Committee on the Bill of Rights of the American Bar Association under date of May 15, 1944, advised Subcommittee No. 2 of the Committee on the Judiciary of the House of Representatives that before the *McNabb* case "there was no effective penalty in operation. . . .

"Then came the McNabb case which did impose a drastic penalty. The seven majority Justices held that unlawful detention shut out the confession. The decision made the speedy production statutes really mean something. The police were no longer left free to enforce the law by disobeying the law." P. v.

Five members of the Special Committee, apparently under the Chairmanship of Professor Zechariah Chafee, Jr., also submitted a Memorandum which said, "The McNabb rule excluding confessions obtained during unlawful detention is an effective penalty for violation of the Acts of Congress." P. 19. It added:

"Congress should be very reluctant to take away the only effective penalty now existing for violation of the fundamental right to have the continuance of custody determined by a magistrate and not by the uncontrolled will of the police, however able and devoted they may be." P. 25.[8]

Notwithstanding that some did gain the impression from the *McNabb* case that it was intended as a discipline of police officers for the violation of the commitment stat-

---

v. *Harris*, 107 Utah 99, 112, 152 P. 2d 91, 97. To the same effect are *Cavazos* v. *State*, 146 Tex. Cr. Rep. 144, 149, 172 S. W. 2d 348, 351, *People* v. *Goldblatt*, 383 Ill. 176, 188, 49 N. E. 2d 36, 41; Royse, J., dissenting, in *Scoopmire* v. *Taflinger*, 114 Ind. App. 419, 434, 52 N. E. 2d 728, 733.

[8] See also the statement of Hon. Francis Biddle, Attorney General, Hearings before Subcommittee No. 2 of the Committee of the Judiciary, House of Representatives, 78th Cong., 1st Sess., on H. R. 3690, p. 27.

utes, a reading of *McNabb* as later explained by *United States* v. *Mitchell, supra,* negatives such a conclusion.

It is true that there are phrases in the *McNabb* opinion that condemn the assumed failure to take the accused promptly before a magistrate.[9] Further Benjamin's confession was barred even though it was given within "five or six hours" of questioning, and without the slightest suggestion of force, after his voluntary surrender because he had heard the officers were looking for him. Perhaps the strongest indication that the *McNabb* decision may have been intended as a penalty for police misconduct occurs in another case decided the same day as *McNabb, Anderson* v. *United States,* 318 U. S. 350. There a man was arrested Sunday night and confessed after two hours' questioning on Monday morning. Nevertheless his confession was held inadmissible under authority of *McNabb.* P. 355.

However, *United States* v. *Mitchell, supra,* made it clear that the purpose of *McNabb* was not to enforce a penalty for police misconduct.[10] In the *Mitchell* case a suspect was arrested and taken to the police station. He confessed within a few minutes of his arrival. He was illegally detained for eight days before being taken before a committing magistrate. "The police explanation of this illegality is that Mitchell was kept in such

---

[9] *E. g.:* "For in their treatment of the petitioners the arresting officers assumed functions which Congress has explicitly denied them. They subjected the accused to the pressures of a procedure which is wholly incompatible with the vital but very restricted duties of the investigating and arresting officers of the Government and which tends to undermine the integrity of the criminal proceeding." Pp. 341–42. "A democratic society, in which respect for the dignity of all men is central, naturally guards against the misuse of the law enforcement process. . . . Experience has therefore counseled that safeguards must be provided against the dangers of the overzealous as well as the despotic." P. 343.

[10] See The *NcNabb* Rule Transformed, 47 Col. L. Rev. 1214.

custody without protest through a desire to aid the police in clearing up thirty housebreakings . . . ." This Court then pronounced this statement as to the exclusion of the confessions as evidence, "These, we have seen, were not elicited through illegality. Their admission, therefore, would not be use by the Government of the fruits of wrongdoing by its officers. Being relevant, they could be excluded only as a punitive measure against unrelated wrongdoing by the police. Our duty in shaping rules of evidence relates to the propriety of admitting evidence. This power is not to be used as an indirect mode of disciplining misconduct." Pp. 70–71. The *Mitchell* explanation of *McNabb* seems correct. It is not the function of courts to provide penalties and sanctions for acts forbidden by statutes where neither statutes nor the common law nor equity procedure have established them.

For the above reasons, I reach the conclusion that the *McNabb* case was not intended as a penalty or sanction for violation of the commitment statute.

B. The Court bases its decision of today on the theory that "a confession is inadmissible if made during illegal detention due to failure promptly to carry a prisoner before a committing magistrate, whether or not the 'confession is the result of torture, physical or psychological . . . .' " The Court holds that this was the *McNabb* rule and adheres to it. I do not think this was the *McNabb* rule and I do think the rule as now stated is an unwarranted extension of the rule taught by the *McNabb* case. My reasons follow.

There is no legal theory expressed in *McNabb* that supports the idea that every confession after unnecessary delay and before commitment is inadmissible. There are a few isolated sentences that do lend credence to such an explanation of the legal theory behind the case, but when read in context, I think it is clear that they do

not expound such a rule.[11]   The physical conditions of the restraint are emphasized, pp. 335–38 and 344–45. Attention is called to the examination, when stripped, of one man.   P. 337.[12]   The *Mitchell* case, *supra,* p. 67, removes all my doubts as to the true *McNabb* rule.   It says: "Inexcusable detention for the purpose of illegally extracting evidence from an accused, and the successful extraction of such inculpatory statements by continuous questioning for many hours under psychological pressure, were the decisive features in the *McNabb* case which led us to rule that a conviction on such evidence could not stand." [13]

---

[11] Cf.: "For in their treatment of the petitioners the arresting officers assumed functions which Congress has explicitly denied them." Pp. 341–42. "Plainly, a conviction resting on evidence secured through such a flagrant disregard of the procedure which Congress has commanded cannot be allowed to stand without making the courts themselves accomplices in willful disobedience of law."   P. 345. "And the effective administration of criminal justice hardly requires disregard of fair procedures imposed by law."   P. 347.   On the other hand, there are repeated expressions such as "the evidence elicited . . . in the circumstances disclosed here," p. 341; "evidence secured under the circumstances revealed here," p. 347, which point the other way.

[12] Apparently such an examination is considered effective coercion. See *Malinski* v. *New York,* 324 U. S. 401.

[13] See also the statement in *Haley* v. *Ohio,* 332 U. S. 596, 606: "Legislation throughout the country reflects a similar belief that detention for purposes of eliciting confessions through secret, persistent, long-continued interrogation violates sentiments deeply embedded in the feelings of our people.   See *McNabb* v. *United States,* 318 U. S. 332, 342–43."

In discussing the effect of the *Mitchell* case, a note in 38 Journal of Criminal Law and Criminology 136, says at p. 137: "There the Court phrased the rule of the *McNabb* case to stand for the proposition that the illegal detention of an accused person will invalidate his confession only when the detention itself acts as an inducement in the procuring of the confession."

424

During detention in violation of the federal commitment statute is the likelihood that police officials will use coercion for the extraction of an involuntary confession so strong as to justify the exclusion by this Court of all confessions to the police obtained after their failure to conform to the requirement of prompt production of the accused before a magistrate? I think not. It must be admitted that a prompt hearing gives an accused an opportunity to obtain a lawyer;[14] to secure from him advice as to maintaining an absolute silence to all questions, no matter how apparently innocuous; to gain complete freedom from police interrogation in all bailable offenses;[15] and that these privileges are more valuable to the illiterate and inexperienced than to the educated and well-briefed accused. Proper protection of the ignorant is of course desirable, but the rule now announced forces exclusion of all confessions given during illegal restraint. It will shift the inquiry to the legality of the arrest and restraint, rather than to whether the confession was voluntary. Such exclusion becomes automatic on proof of detention in violation of the commitment statute, followed by a confession to police officials before commitment. It is now made analogous to the exclusion of evidence obtained in violation of the Bill of Rights through unreasonable search and seizure or through compulsion or by denial of due process. I do not think this is the doctrine of the *McNabb* case or that it should now be made an explicit rule of federal law.

The rule as to the inadmissibility of evidence in federal courts obtained in violation of the Bill of Rights, Fourth and Fifth Amendments is, it seems to me, inapplicable

[14] Rules of Criminal Procedure, Nos. 5 (b) and 44.

[15] 18 U. S. C. §§ 3041, 3141; Rules of Criminal Procedure, No. 46 (a) (1).

as an analogy to a situation such as existed in the *Mc-Nabb* case and here.[16]   By assumption of this Court, in the *McNabb* case the McNabb confessions were obtained without "disregard of liberties deemed fundamental by the Constitution," *McNabb* v. *United States, supra,* 339, *i. e.,* without violation of the Bill of Rights.   I take it the same assumption applies as to Upshaw.   Under this assumption, the McNabb confessions would have been admissible if the Court had not believed there was a failure to follow the statute on commitments.   Confessions, of course, are also inadmissible when coerced in violation of constitutional due process under the Fourteenth Amendment.   *Malinski* v. *New York,* 324 U. S. 401, 404; *Haley* v. *Ohio,* 332 U. S. 596.   When other evidence is the direct result of an unconstitutional act such as a violation of the Fourth Amendment, this Court has said, in federal cases, that to permit its use would impair the protection of this major guaranty of a free

---

[16] Fourth Amendment: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Fifth Amendment: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

See *Weeks* v. *United States,* 232 U. S. 383; *Boyd* v. *United States,* 116 U. S. 616; *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385; *Gouled* v. *United States,* 255 U. S. 298; *Harris* v. *United States,* 331 U. S. 145, 150.

country.[17]  When, as in the *McNabb* case, there are confessions after failure to observe statutory directions not shown to have coerced the confessions the rule as to evidence extracted in defiance of the Constitution does not apply.[18]

---

[17] *Weeks* v. *United States*, 232 U. S. 383, 393: "If letters and private documents can thus be seized and held and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution. The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land."

[18] Compare the statement of Chief Justice Taft:

"Nor can we, without the sanction of congressional enactment, subscribe to the suggestion that the courts have a discretion to exclude evidence, the admission of which is not unconstitutional, because unethically secured. This would be at variance with the common law doctrine generally supported by authority. There is no case that sustains, nor any recognized text book that gives color to such a view. Our general experience shows that much evidence has always been receivable although not obtained by conformity to the highest ethics. The history of criminal trials shows numerous cases of prosecutions of oath-bound conspiracies for murder, robbery, and other crimes, where officers of the law have disguised themselves and joined the organizations, taken the oaths and given themselves every appearance of active members engaged in the promotion of crime, for the purpose of securing evidence. Evidence secured by such means has always been received.

"A standard which would forbid the reception of evidence if obtained by other than nice ethical conduct by government officials would make society suffer and give criminals greater immunity than has been known heretofore. In the absence of controlling legislation by Congress, those who realize the difficulties in bringing offenders to justice may well deem it wise that the exclusion of evidence should be confined to cases where rights under the Constitution would be violated by admitting it." *Olmstead* v. *United States*, 277 U. S. 438, 468.

This Court by decision has excluded evidence obtained by unreasonable search and seizure under the Fourth Amendment or by coercion to a degree that violates the Fifth or the Fourteenth Amendments because the admission of such evidence would imperil the efficacy of those constitutional rights. If confessions obtained during unlawful detention are not excluded by the fact of unlawful detention alone, the constitutionally guaranteed rights of the accused are nevertheless protected by the rule that no involuntary confession is admissible. It is therefore unnecessary for constitutional reasons to extend this protection to evidence obtained through violation of a statute or a rule of criminal procedure by those to whom the confession is made. In criminal trials, the method of obtaining evidence has never been a reason for barring its use except where constitutional rights were violated.[19] The prohibition of wiretapping in § 605 of the Federal Communications Act is not the basis for the exclusion in prosecutions of evidence so obtained. The exclusion of such evidence is based on an explicit direction of the section that information so obtained should not be divulged.[20] Congress could, of course, pass such a statute to prohibit the use of a confession as evidence, if obtained during an unlawful detention. The rule of the *Olmstead*

---

[19] *E. g., Proceedings Against Bishop Atterbury,* 16 How. St. Tr. 323, 495, 629–30 (1723); *Sylvester Thornton's Case,* 1 Lewin C. C. 49 (1824); *Rex* v. *Derrington,* 2 C. & P. 418 (1826); *Reg.* v. *Granatelli,* 7 State Tr. N. S. 979, 987 (1849); *Hart* v. *United States,* 76 U. S. App. D. C. 193, 130 F. 2d 456 (C. A. D. C. 1942).

"It is necessary in this connection to distinguish between evidence illegally procured and evidence procured by unconstitutional search and seizure." *Hart* v. *United States, supra,* at p. 459.

The English exception to this rule for confessions obtained by police questioning was rejected by this Court, after careful consideration, in *Bram* v. *United States,* 168 U. S. 532, 556–58.

[20] *Nardone* v. *United States,* 302 U. S. 379, 382; *Goldstein* v. *United States,* 316 U. S. 114, 118.

case, 277 U. S. 438, 466, derived from the common law that the admissibility of evidence is not affected by conduct of investigators where there is no violation of a constitutional guaranty, stands unimpaired.

If this judicial rule of exclusion of all confessions secured after illegal detention is adhered to, it must mean that this Court thinks illegal detention is so likely to result in "third degree" that it should be outlawed *per se*. There is a reference to "third degree" in *McNabb,* p. 344, but, as indicated above, p. 425, no reliance upon the detention as coercive in the due process sense.[21]  If illegal detention, *per se,* is believed sufficiently likely to produce a coerced confession as to justify exclusion of such confessions as evidence, it does not require this extension of the *McNabb* rule to make such evidence inadmissible. A court never knows whether a confession is or is not voluntary.  It bars confessions on uncontroverted proof of facts which as a matter of law are deemed so coercive as to be likely to produce an involuntary confession. *Chambers* v. *Florida,* 309 U. S. 227, 238–39; *Malinski* v. *New York,* 324 U. S. 401, 404.  If illegal detention alone were deemed that coercive, the confessions would be barred as a matter of due process in both state and federal courts.[22]  So here if illegal detention alone is the decisive

---

[21] Others have viewed the exclusion of confessions in the *McNabb* case as based on their extraction by near third-degree measures. Hearings before Subcommittee No. 2 of the Committee on the Judiciary, House of Representatives, 78th Cong., 1st Sess., on H. R. 3690, p. 92:

"The McNabb decision does not even prevent the use of the man's own confession against him.  What it does do is prevent the use against him of a confession obtained by third degree means or by means akin to third degree in the form of the secret detention and failure to bring him promptly to the committing officer."

[22] Cf. *Haley* v. *Ohio,* 332 U. S. 596, 599, where this Court said in stronger language than it had ever used before, "If the undisputed evidence suggests that force or coercion was used to exact the con-

factor, the rule of exclusion surely will apply to both state and federal trials as violative of the Due Process Clause. But the *McNabb* rule does not apply to trials in state courts.[23] It is because illegal detention was not thought to be *per se* coercive that it was necessary to create the *McNabb* rule of exclusion.

For the foregoing reasons, I conclude that detention alone, even for the purpose of obtaining information, should not be sufficient to justify the exclusion of a confession to police officers obtained after unnecessary delay and before commitment.

C. This brings me to a statement of the true rule of the *McNabb* case, as I understand it. This rule is that purposeful, unlawful detention illegally to extract evidence and the successful extraction of confessions under psychological pressure, other than mere detention for limited periods, makes confessions so obtained inadmissible. This statement is a paraphrase of the *Mitchell* interpretation referred to in the preceding subdivision. It means that pressure short of coercion but beyond mere detention makes confessions inadmissible. Obviously there is a wide range of discretion as to how much psychological pressure is necessary. If any material amount is sufficient, the rule differs little from one denying admissibility if obtained during illegal restraint. If almost coercion is required, the rule will differ little from that excluding an involuntary confession. Under this interpretation of *McNabb*, I suppose, as in coerced confessions, it should be left to a jury to decide whether there was enough evidence of pressure where the admitted facts do not show improper pressure as a matter of law.

---

fession, we will not permit the judgment of conviction to stand, even though without the confession there might have been sufficient evidence for submission to the jury."

[23] *Townsend* v. *Burke,* 334 U. S. 736, 738.

## II.

The Court now says that illegal detention alone is sufficient to bar from evidence a confession to the police during that unlawful detention. As I think this is an improper extension of the *McNabb* rule, I proceed to state the application of the *McNabb* rule, as I understand it, to Upshaw's situation. Perhaps Upshaw's arrest without a warrant was also without reasonable cause on the part of the arresting officer to believe he had committed a felony. This unlawful arrest is not relied upon in the opinion. So far as the admissibility of the confession is concerned, it makes no difference that it may have been obtained as the result of an illegal arrest or an unlawful detention. I think there was less psychological pressure upon Upshaw than there was upon the McNabbs. That precedent, therefore, if the true *McNabb* rule is properly stated in Part I, subdivision C, above, does not require me to declare Upshaw's confession inadmissible. In the Mc-Nabbs' case, the facts of their illegal detention that caused this Court's action appear from the opinion as set out below.[24] As for Upshaw the facts are detailed in the foot-

[24] 318 U. S. at 334–38:

"Immediately upon arrest, Freeman, Raymond, and Emuil were taken directly to the Federal Building at Chattanooga. They were not brought before a United States commissioner or a judge. Instead, they were placed in a detention room (where there was nothing they could sit or lie down on, except the floor), and kept there for about fourteen hours, from three o'clock Thursday morning until five o'clock that afternoon. They were given some sandwiches. They were not permitted to see relatives and friends who attempted to visit them. They had no lawyer. There is no evidence that they requested the assistance of counsel, or that they were told that they were entitled to such assistance.

"Barney McNabb, who had been arrested early Thursday morning by the local police, was handed over to the federal authorities about nine or ten o'clock that morning. He was twenty-eight years old; like the other McNabbs he had spent his entire life in the Settlement,

had never gone beyond Jasper, and his schooling stopped at the third grade. Barney was placed in a separate room in the Federal Building where he was questioned for a short period. The officers then took him to the scene of the killing, brought him back to the Federal Building, questioned him further for about an hour, and finally removed him to the county jail three blocks away.

"In the meantime, direction of the investigation had been assumed by H. B. Taylor, district supervisor of the Alcohol Tax Unit, with headquarters at Louisville, Kentucky. Taylor was the Government's chief witness on the central issue of the admissibility of the statements made by the McNabbs. Arriving in Chattanooga early Thursday morning, he spent the day in study of the case before beginning his interrogation of the prisoners. Freeman, Raymond, and Emuil, who had been taken to the county jail about five o'clock Thursday afternoon, were brought back to the Federal Building early that evening. According to Taylor, his questioning of them began at nine o'clock. Other officers set the hour earlier.

"Throughout the questioning, most of which was done by Taylor, at least six officers were present. At no time during its course was a lawyer or any relative or friend of the defendants present. Taylor began by telling 'each of them before they were questioned that we were Government officers, what we were investigating, and advised them that they did not have to make a statement, that they need not fear force, and that any statement made by them would be used against them, and that they need not answer any questions asked unless they desired to do so.'

"The men were questioned singly and together. As described by one of the officers, 'They would be brought in, be questioned possibly at various times, some of them half an hour, or maybe an hour, or maybe two hours.' Taylor testified that the questioning continued until one o'clock in the morning, when the defendants were taken back to the county jail.

"The questioning was resumed Friday morning, probably sometime between nine and ten o'clock. 'They were brought down from the jail several times, how many I don't know. They were questioned one at a time, as we would finish one he would be sent back and we would try to reconcile the facts they told, connect up the statements they made, and then we would get two of them together. I think at one time we probably had all five together trying to reconcile their statements . . . When I knew the truth I told the defendants

432

what I knew. I never called them damned liars, but I did say they were lying to me. . . . It would be impossible to tell all the motions I made with my hands during the two days of questioning, however, I didn't threaten anyone. None of the officers were prejudiced towards these defendants nor bitter toward them. We were only trying to find out who killed our fellow officer.'

"Benjamin McNabb, the third of the petitioners, came to the office of the Alcohol Tax Unit about eight or nine o'clock Friday morning and voluntarily surrendered. Benjamin was twenty years old, had never been arrested before, had lived in the McNabb Settlement all his life, and had not got beyond the fourth grade in school. He told the officers that he had heard that they were looking for him but that he was entirely innocent of any connection with the crime. The officers made him take his clothes off for a few minutes because, so he testified, 'they wanted to look at me. This scared me pretty much.' He was not taken before a United States Commissioner or a judge. Instead, the officers questioned him for about five or six hours. When finally in the afternoon he was confronted with the statement that the others accused him of having fired both shots, Benjamin said, 'If they are going to accuse me of that, I will tell the whole truth; you may get your pencil and paper and write it down.' He then confessed that he had fired the first shot, but denied that he had also fired the second.

"Because there were 'certain discrepancies in their stories, and we were anxious to straighten them out,' the defendants were brought to the Federal Building from the jail between nine and ten o'clock Friday night. They were again questioned, sometimes separately, sometimes together. Taylor testified that 'We had Freeman McNabb on the night of the second [Friday] for about three and one-half hours. I don't remember the time but I remember him particularly because he certainly was hard to get anything out of. He would admit he lied before, and then tell it all over again. I knew some of the things about the whole truth and it took about three and one-half hours before he would say it was the truth, and I finally got him to tell a story which he said was true and which certainly fit better with the physical facts and circumstances than any other story he had told. It took me three and one-half hours to get a story that was satisfactory or that I believed was nearer the truth than when we started.'

"The questioning of the defendants continued until about two o'clock Saturday morning, when the officers finally 'got all the dis-

note.[25]  The time between confession and commitment is not significant. *United States* v. *Mitchell, supra.* The indications of pressure on the McNabbs that lead me to

crepancies straightened out.' Benjamin did not change his story that he had fired only the first shot. Freeman and Raymond admitted that they were present when the shooting occurred, but denied Benjamin's charge that they had urged him to shoot. Barney and Emuil, who were acquitted at the direction of the trial court, made no incriminating admissions." [Footnotes omitted.]

In appraising the severity of the McNabb pressure for confessions in comparison with that exerted in the Upshaw detention, it should also be borne in mind that in the *Anderson* case, 318 U. S. at 355, a confession was excluded that resulted from two hours' questioning. I have no explanation for this exclusion. If it was intended to make two hours' questioning a bar to a confession, the later *Mitchell* case is inconsistent with such a conclusion. See the quotation preceding note 13, *supra.* The opinion does not rely upon it and it seems to me obviously within permissible limits unless we are to use the penalty theory. See p. 421, *supra.*

[25] Upshaw, a Negro man able to read and write who had completed one year of high school, was arrested at his room by Detectives Furr and Culpepper on a charge of larceny of a wrist watch at about 2 a. m., Friday, June 6. He was taken to No. 10 precinct and questioned for about 30 minutes. Furr testified that petitioner was under the influence of alcohol at the time. Upshaw denied this. He was coughing sporadically at the time of his arrest and subsequently until his commitment. At approximately 10 a. m., June 6, he was questioned again by Furr, at which time he denied guilt. Culpepper questioned him through the bars in the cell block at 11 a. m. and again at 5:30 p. m. on June 6. Furr questioned him again for approximately 30 minutes at 7:30 p. m. on the same day. At 9 a. m., June 7, Upshaw confessed, and at 9:30 a. m. he signed a statement which he identified as his statement at 2 p. m., June 7. Thus some 31 hours intervened between the arrest and the confession. At 9 p. m. that night Upshaw was taken to the home of the complaining witness where he repeated his confession to her.

The petitioner was taken before a magistrate for commitment on Monday, June 9. The officers testified that they had not had him committed sooner because they did not have a sufficient case against him to cause the Police Court to hold him and because they wanted to continue their investigation.

conclude that the Court should hold Upshaw's confession admissible under my understanding of the *McNabb* rule before this present holding are the lack of experience of the McNabbs, the "breaking" of Benjamin by confrontation of charges of his guilt by his relatives and confederates, the greater number of officers questioning them, and the longer time the McNabb group was interrogated.[26]

## III.

I do not agree that we should now extend the *McNabb* rule by saying that every confession obtained by police after unnecessary delay in arraignment for commitment and before magisterial commitment must be barred from the trial. Those most concerned with a proper administration of the criminal law are against any extension.

(1) The departure of the *McNabb* and *Anderson* cases from well-established methods for protection against coercion has been condemned by the House of Representatives and not acted upon by the Senate.[27]

(2) Officers charged with enforcement of the criminal law have objected for the reason that fear of the application of its drastic penalties deterred officers from questioning during reasonable delays in commitment.[28]

(3) State courts under similar laws and conditions have refused to follow the *McNabb* example.[29]

---

[26] See 47 Col. L. Rev. 1214, 1217, The *McNabb* Rule Transformed.

[27] 93 Cong. Rec. 1392; H. R. Rep. No. 29, 80th Cong., 1st Sess.

[28] International Association of Chiefs of Police, Hearings, *supra*, 43; National Sheriffs' Association, Hearings, *supra*, 26; Attorney General of the United States, H. R. Rep. No. 29, *supra*.

[29] *Fry* v. *State*, 78 Okla. Cr. 299, 313, 147 P. 2d 803, 810–11; *State* v. *Folkes*, 174 Ore. 568, 588, 150 P. 2d 17, 25; *State* v. *Smith*, 158 Kan. 645, 651, 149 P. 2d 600, 604; *People* v. *Malinski*, 292 N. Y. 360, 370–372, 387, 55 N. E. 2d 353, 357, 365; *State* v. *Collett*, 58 N. E. 2d 417, 426–27 (Ohio); *State* v. *Nagel*, 75 N. D. 495, 28 N. W. 2d 665,

(4) Law Review comment generally condemns the rule.[30]

In the Federal Rules of Criminal Procedure, Preliminary Draft, submitted May 3, 1943, to this Court, there was included a § 5 (b) which purported to codify the *McNabb* rule.[31] In response to widespread opposition to such a codification,[32] this section of Rule 5 was omitted from the final draft. These rules were drawn by a representative committee of the bench and bar with wide participation beyond the membership by interested parties from both groups. They were transmitted on December 26, 1944, by this Court to the Attorney General to be reported to Congress, more than a year after the *McNabb* case and after the hearings on the House bill to nullify the *McNabb* rule. Neither this Court nor the Congress restored the rejected proposal.

Instead of an extension of the *McNabb* rule, I feel that it should be left, as I think it originally was, a rule that barred a confession extracted under psychological pressure of the degree used in the *McNabb* case.

Such condemnation of even the restricted *McNabb* rule by those immediately responsible for the enactment and

---

679; *State* v. *Ellis*, 354 Mo. 998, 1005, 193 S. W. 2d 31, 34; *Finley* v. *State*, 153 Fla. 394, 14 So. 2d 844; *State* v. *Browning*, 206 Ark. 791, 793–798, 178 S. W. 2d 77, 78–80; *Russell* v. *State*, 196 Ga. 275, 285, 26 S. E. 2d 528, 534.

[30] Inbau, The Confession Dilemma in the United States Supreme Court, 43 Ill. L. Rev. 442; 42 Mich. L. Rev. 679; 56 Harv. L. Rev. 1008; 47 Col. L. Rev. 1214. See Statement of Special Committee on the Bill of Rights of the American Bar Association, p. vi, which advocates maintenance of *McNabb* rule until a better system for dealing with confessions to police can be devised.

[31] "5 (b) EXCLUSION OF STATEMENT SECURED IN VIOLATION OF RULE. No statement made by a defendant in response to interrogation by an officer or agent of the government shall be admissible in evidence against him if the interrogation occurs while the defendant is held in custody in violation of this rule."

[32] Holtzoff, Institute on Federal Criminal Rules, 29 A. B. A. J. 603.

administration of our criminal laws should make this Court, so far removed from the actualities of crime prevention, hesitate long before pushing farther by judicial legislation its conception of the proprieties in criminal investigation.  It takes this step in the belief that thereby it strengthens criminal administration by protecting a prisoner.  A prisoner should have protection but it is well to remember that law and order is an essential prerequisite to the protection of the security of all.  Today's decision puts another weapon in the hand of the criminal world.  Apparently the Court intends to make the rule of commitment "without unnecessary delay"[33] an iron rule without flexibility to meet the emergencies of conspiracies, search for confederates, or examining into the ramifications of criminality.  The Court does this by failing to distinguish between necessary and unnecessary delay in commitment.  It uses words like "forthwith" and "promptly" and thus destroys the leeway given by the Rule to police investigations.  All, I think, without any need for such action since every coerced confession has been inadmissible for generations.  The position stated in this dissent does not envisage a surrender to evils in the handling of criminals.  If there is a prevalent abuse of the right to question prisoners, the sounder remedy lies in police discipline, in statutory punishment of offending officials, in vigorous judicial protection against unconstitutional pressures for confessions, and in legisla-

---

[33] Rule 5 (a), Rules of Criminal Procedure.  The language of the Rule was adopted to allow desirable flexibility in the time of commitment.  See Notes to Rules of Criminal Procedure, as prepared under the direction of the Advisory Committee; Hearings, *supra*, pp. 36, 39.  In Memorandum on the Detention of Arrested Persons, *supra*, it is stated at p. 30 with reference to the phrase "within a reasonable time": "This phrase would have the advantage of saving confessions where the delay in committal was brief and reasonably explained; here the existing tendency of lower courts to apply the McNabb rule rigidly is pretty harsh on the government."

tive enactments for inquiries into circumstances surrounding crimes by methods that protect both the public and suspects—for example, an inquiry before a magistrate with sealed evidence.

I would affirm this conviction in reliance upon the verdict of the properly instructed jury that this was a voluntary confession.